May I please report? Mr. Lomeli appealed his conviction for conspiracy to distribute methamphetamine in a sentence of 312 months. At the trial court level, prior to the trial beginning, there was a motion to suppress evidence. Essentially in the motion to suppress evidence, in the declaration, the agent indicated that agents overheard wiretapped communications demonstrating that another co-conspirator was meeting with Mr. Lomeli at a specific residence at the great court residence to obtain drugs. However, upon further review, there was no such communication. Mr. Lomeli argued to the court that in fact there was a misrepresentation by the agent in the affidavit. And absent that misrepresentation that in fact there would be no probable cause for the search at the great court residence. Also at trial, the government introduced significant evidence of multiple overt acts. Mr. Lomeli's theory of defense was that there were multiple conspiracies and that many of the overt acts were attributed to other conspiracies, not the charged conspiracy involving Mr. Lomeli. The court found that there was evidence of this, and for that reason, the court did allow the multiple jury instruction. However, there were only two witnesses that Mr. Lomeli sought to use at trial to prove his defense. One witness was a co-conspirator named Veronica Ojeda. The other potential witness was another individual named Luis Rodelo. Can I ask you about Rodelo? Yes, Your Honor. I'm trying to get the sequence of events straight. Sometime before trial, you filed an ex-party, your side filed an ex-party application for writs for these two witnesses. And then the next mention of them is on the sixth day of trial in the record when the judge has the marshal come in and take the fifth. I understand as to her. I'm trying to find that as to Mr. Rodelo. Was it not until the sixth day of trial that people learned that Mr. Rodelo would be delayed in being brought to court? Yes, Your Honor. Perhaps a day or so before that, the marshals advised the court that Mr. Rodelo was in a supermatch facility in Colorado. And not only was he in a supermatch facility, he was also in the shoe at that facility. Had the judge issued a writ at that point? Yes, Your Honor. So the writ had already been issued, but the witness hadn't been brought there. Correct, Your Honor. So the writ had been issued prior to the trial beginning. So the writs, I believe, had already been issued for both individuals. Okay. Now, at some point, and the judge said, could I have a proffer to the defense? And the defense said essentially what you just said. We would expect Mr. Rodelo to testify that the crime that he committed when he was apprehended was not in furtherance of this conspiracy, but in furtherance of some other conspiracy. Well, it seems to me, Your Honor, the government had introduced evidence of one overt act, that Mr. Rodelo was arrested. The government attributed the amount of methamphetamine that he had in his possession to the conspiracy involving Tony Little. Did they? I'm going back in the record. What happened was the agent was describing what your client said were losses in a phone call. And when asked what the losses were, he said, well, there were two instances where people coming across the border were apprehended. Mr. Rodelo wasn't named with respect to that. But one of those incidents was his apprehension. We all agree. Right. And essentially in the government's trial memorandum for that particular date and that seizure, it related to Mr. Rodelo. Right. I'm just trying to get this sequence straight now. So you say Mr. Rodelo would testify that you hoped Mr. Rodelo would testify that he was involved in some other conspiracy when being seized, not a conspiracy with Mr. Lamella, right? Well, Your Honor, in addition to hoping, in fact, the government had interviewed Mr. Rodelo and the government produced an ROI of that interview. And in that interview, Mr. Rodelo indicated that he did not know, I believe he did not know Mr. Lamella and that he did not indicate that, in fact, he was smuggling drugs for Mr. Lamella. Right, right. So there was a guess on the part of the government. But at trial, the agent did attribute, the agent indicated, and I'll look for the site to the record, the agent indicated that on, I believe it, Your Honor, just give me one moment, I'll give the exact date. July 4th or July 5th. Right. Take your word for it. July 5th, I believe, yes, Your Honor, that agents had apprehended one of their couriers. Right, right. And attributing that to the conspiracy. Well, yeah, and let's put that aside for a second. I'm just trying to get to what happened. But wait, can we, I just want to understand, how Mr. Rodelo, how did you think Mr. Rodelo would bolster your defense? Yes, Your Honor. Because the agent had indicated that he was a courier, that they had seized Mr. Rodelo, and I knew from the discovery and from the ROI that they were referring to Mr. Rodelo in that particular seizure, then looking to the ROI, Mr. Rodelo, there was no evidence. As a matter of fact, Mr. Rodelo indicated that, in fact, he did not know a Mr. Tony Lomelli, that it was not fair to meet anyone that he knew associated, basically, with Mr. Lomelli. And so the government essentially was making the assertion, the claim, without really having sufficient evidence. And so I wanted to demonstrate that. But he wasn't, he wasn't identified by name, correct, during the trial? Right, right. No, no. And then the judge said, in disposing of this, and I want to get to what happened here, the judge said, let's not let the government argue that anything that Mr. Rodelo did was an overt act. You're instructed not to argue that. Correct? Yes, Your Honor, correct. Okay. And you had not talked to Mr. Rodelo, I mean, your side of the case, you had not talked to Mr. Rodelo prior to that time. That's correct, Your Honor. The only information that we have from Mr. Rodelo was the R.R., yes. The judge said, I'll set up a phone call so you can talk to him, 845 tomorrow morning. The record does not, this is, I'm sorry for wandering to here, but this is what I'm trying to find, there's a gap in the record here. The record does not indicate, so far as I can tell, whether or not the defense ever talked to Mr. Rodelo. No, Your Honor, Mr. Rodelo was never produced for conversation. Essentially what occurred is that the court did hold a hearing outside the presence of the jury where the court questioned Mr. Rodelo's attorney. Right, and we have that in the record. Correct, Your Honor. My question is, there's nothing in the record that suggests that you actually talked to Mr. Rodelo. No, Your Honor, we did not, and we were not given that opportunity. Okay, but you were given the opportunity to present him telephonically as a witness, correct? That is correct, Your Honor. We felt that it was necessary for the jury to not only hear Mr. Rodelo, but to have the opportunity to observe him. We believe that part of the jury determining credibility, what weight to give a particular witness, would be to also view the witness, determine their demeanor in open court. And given that he was only one of two potential witnesses that we had, we believe that that was very significant. What difference does it make here that Mr. Rodelo's counsel, and I've read that part of the record, says, I would advise him to take the fifth with respect to anything but an admission that he would stop coming across the border with drugs. Because he was never charged with a conspiracy count, and were he to testify that I was not bringing them for Mr. Lomelli, but rather for somebody else, he would subject himself to prosecution. Well, in fact, he was already prosecuted, Your Honor. But only on a substantive count. That's correct, Your Honor. That's correct, Your Honor. Was he serving his time for that conviction at the time? Yes, Your Honor. And was Mr. Lomelli ever held responsible for any of Mr. Rodelo's acts, whether in sentencing or during the trial? Well, that would be difficult to say, because during the trial, because that quantity both was testified to at trial in that seizure, and then also even in the government's trial memorandum, they included that overt act in that particular seizure. But they weren't allowed to argue it to the jury. They weren't allowed to argue it to the jury, but they, again, in our position, that Agent Flett's testimony about it at least brought that into the case. And with regard to Judge Wardlow's question, was his sentence enhanced in any way because of the quantity of drugs Mr. Rodelo was bringing across the border? Given the other overt acts, Your Honor, and the amount of drugs, I don't believe so, Your Honor. I don't believe that it impacted his sentence ultimately, though it did impact, I believe, his ability to present his fair defense. And I think given that the government did introduce that overt act as evidence directly against, I believe, Mr. Lomelli, that he has constitutional right to try to rebut that evidence. I'm still a little bit confused on this. Was it introduced as an overt act, or was it simply described by the agent to tell the jury what the telephone call meant when somebody talked about losses? In other words, the overt acts are, as I understand it, somebody says to the jury, we're required to produce evidence of overt acts, and here's what they are. But drug conspiracies don't have overt acts. U.S. v. Shabani, Supreme Court, says there's no overt act in a drug conspiracy. Yes, Your Honor. You know, I'm not, and perhaps I'm inartfully using the term, and so I'm not suggesting overt act in the sense that they had to allege, particularly those in the indictment, and then plead them up. Essentially, I'm indicating that the government set forth specific transactions or incidents involving drugs. On this particular case, if I'm looking at the transcript, Agent Fletch testifying basically on July 5th, we actually stopped one of the body carriers at the border bringing in a pound of methamphetamine. And so in terms of the government proving up the case and the conspiracy against Mr. Lomelli, this is one instance, one transaction of other transactions that the government offered against Mr. Lomelli. Didn't you argue that Rodello was working for another gentleman by name Ulloa, U-L-L-O-A? I didn't argue that in terms of – I didn't have a connection with Mr. Rodello and Mr. Ulloa. I did argue, however, Your Honor, that the other individual who the court issued the writ for, the initial writs for, Veronica Ojeda, that in fact she was both really an overlapping conspirator. That the evidence demonstrated that she was perhaps involved in a conspiracy involving Mr. Lomelli and Mr. Ulloa. And then also we believe the evidence demonstrated that Mr. Ulloa had his own conspiracy, his own distribution that he also used Ms. Ojeda in that. And you brought that out in cross-examination of Mr. Ulloa? Yes, Your Honor. I did bring that out. We would have – it was not solidified quite as much as the defense would have liked, Your Honor, because of course Mr. Ulloa, given that he was a cooperating witness for the government, he was at times equivocating and it was a bit difficult to nail him down. So I did bring out enough information for the court to believe that it was a valid theory of defense, that there was some evidence to it. However, given that we weren't able to produce our witness on it, we weren't able to really make the case strongly with any witnesses for the defense. But you got a multiple conspiracy instruction? I did get a multiple. And did you also get the corollary instruction that a conspirator doesn't need to know all of his co-conspirators? I'm sure, Your Honor, that that was also an instruction as well, Your Honor. I think the important thing here, though, with Ms. Ojeda was that there were two specific transactions that the government did introduce, one for July 5th, I believe, 2000, July 12th, 2000, July 5th, 2012, I believe, and July 17th, 2012. And those two transactions involved Ms. Veronica Ojeda. And what was interesting there, again, the government attributed those two transactions to the conspiracy involving Mr. Lomelli, when in fact Mr. Ulloa, who went on the stand, he indicated that he had his own source of supply, he had a source of supply in Mexico, Cesar, for example. And on that particular couple days prior to the first of those two transactions, he received a shipment, and then that shipment he passed along to Ms. Ojeda. But isn't the problem Ms. Ojeda? You made the point well below, and the judge agreed with you. She was a relevant witness. She had something that could be said, but she also told the court she would take the fifth with respect to any questions that went past the very narrow basis of her plea agreement. So how were you going to be able to establish this stuff if she took the fifth? Well, in her plea agreement, Your Honor, she actually admitted factually to those two overt acts. And those were the overt acts. I struggled here. I apologize. That's inartful. Transactions, drug transactions. And those were the transactions that the defense wanted to question her about. We did not need to go beyond those transactions. But wouldn't the government have then said, and by the way, weren't those transactions part of your conspiracy with Mr. Linnelli, and she would have said, I take the fifth? Well, she already pled guilty to that, Your Honor. So our position was that she no longer had a Fifth Amendment privilege, and the court also found, the district court found, that she did not have a Fifth Amendment privilege to what we wanted to question her about. She did not have the Fifth Amendment privilege as to what she agreed was the factual predicate of the offense that she pled guilty to. Right. And so in her plea agreement, it specifically laid out those two. No, I agree with you. The court found that she didn't have a privilege as to what you wanted to question her about, but the court found that she had a privilege as to anything the government would want to question her about. And so that's why I'm asking, doesn't that weigh in to whether to make her testify? Well, Your Honor, I would argue and point the court back to the U.S. v. Shirley case where the court did side with what's in favor of a District of Columbia case, I believe it's a Pardon case. And in that case, Your Honor, this exact issue came up where there was a tension between basically the defendant's right to compulsory testimony and then the government's right to fair and open cross-examination. And there was the same exact tension that existed there. And that court said, well, in that situation that the government's right to really fairly go on into different additional areas must give way to the defendant's right to compulsory process under, I believe, the Sixth Amendment. And so we were arguing here that, in fact, that same analysis we think should apply because the government would not have been prejudiced. When you look at the transcript, you look at the amount of evidence that the government put in, there was no prejudice to the government, particularly given that the government was the party that brought up those two particular instances. And so the defense was looking for the fair opportunity to rebut what the government had already brought in against the defendant. So in this situation, the government essentially, they got it both ways. They were able to introduce it against the defendant, and when the defendant wanted to defend against it, the government argued, well, we would like to now go into other additional testimony, without really making a showing that their case would be prejudiced in any way if they were precluded, if the government did allow the defense to question Ms. Ojeda. So in this situation, Your Honor, we'd argue that Mr. Lomeli, he had a great need for these two witnesses. They were his only two witnesses that he could produce in defense of his case. And essentially, by not allowing either witness, Your Honor, he was deprived, we're arguing, of his right to present his defense and his 6th Amendment right to compulsory process. I believe I'm over. Right. We've taken up a lot of your time with questioning, so if you want to add anything else, that's fine. Certainly, Your Honors. Essentially, we're arguing that we believe that this was really a constitutional violation. We're not arguing that this is an issue where there was insufficient evidence. We're arguing that the court determined that Ms. Ojeda did have material information for Mr. Lomeli's defense, but the court, even though she had material information, and even though the court did determine that the theory of defense was valid, the court still deprived Mr. Lomeli of the opportunity to call her as a witness. And under these circumstances, where the defense only had essentially two witnesses and both would have been needed to be called pursuant to a writ, by not allowing the defense to call either one of the witnesses, the defense was left without any of its witnesses to call to make its case. And in so doing, we're arguing that the court deprived Mr. Lomeli of his right to present a defense and his 6th Amendment right to compulsory due process. Thank you. All right. Thank you very much, counsel. Good morning. Gail Blankenship on behalf of the United States. May it please the court, I would like to direct first my comments to some of the questions regarding the record that were brought up during the questioning of opposing counsel. And with respect specifically to whether or not Mr. Rodello engaged in a telephonic conversation that was made available to the defense counsel on approximately day 6 or day 7 of the trial. In fact, he was given that opportunity and declined that opportunity. Does the record indicate that? I mean, I infer it from the record because there's no further reference to it, but is there someplace in the record where counsel says, I declined the opportunity to have a telephonic conversation with Mr. Rodello? Yes, Your Honor, and it's approximately supplemental excerpt of record 808. I was reviewing it last night. It's in that area because it's during the back and forth between the district court and the defense counsel. It was a sidebar, ex parte. Right. What bothers me about that is I don't see how that cures the problem here because the district court made a ruling that he was entitled to call Mr. Rodello as a witness, that he had met his showing that Mr. Rodello was a necessary witness and he was relevant to his multiple conspiracy defense in the case. So having made that finding, that meant that Rodello was in a position where he should have been brought to testify. And as I understand it, the only reason he wasn't was because of some paperwork snafu, according to the judge. Actually, Your Honor, the court went in and made amended findings of fact and supplemented the record as to whether or not Rodello's testimony was necessary further on following the ex parte, and it was after the time when Mr. Rodello's attorney Well, yeah, but you can't go back and amend a record to fit a way that would uphold the conviction. No, Your Honor, I'm sorry I misspoke, Your Honor. He supplemented his findings prior to, during the course of the proceedings. I hope I wasn't unfair on that. Well, it's still, I mean, don't you, okay, set aside the district court's conclusion. Don't you think Rodello met the, don't you think that Mr. Lomeli met the minimum standard required to Absolutely, absolutely not, Your Honor. Absolutely not. The basis for his testimony was pure speculation. Contained in the supplemental excerpts of record, at the very near the end, I think it's around page 1400 to 1500 of the excerpts of record, there's the actual ROI to which defense counsel is referring. And in that ROI, it contains the subject, the interview with Rodello. And Rodello says, not I don't know or I wasn't involved with Mario. It says, I will not say who my source of supply is. It actually, that interview is not something that averts that it was somebody else. It says, I'm not going to say who it was. And the district court made a specific finding that in this particular case, or in many cases, somebody who is initially apprehended at the border will deny knowing sources of supply or won't mention that. But oftentimes during debriefs, they will actually come around and give that type of information. This is a case that, and this is one of those cases. Mr. Rodello is apprehended at the port of entry on July 5th as body carrier. We didn't bring that evidence in other than to highlight to the court or to the jury that calls from Lomeli to Mario about recent losses were attributed to a cooperator or somebody that they believed to be a snitch, Carlos Ponce Ramirez, who was one of the cooperators who testified at trial. And attributing those losses to Ponce being a snitch and attributing those losses to the extent that they were ready to take him out. The only reason we introduced that particular testimony was just one sentence during the course of a five, six, seven day trial where the agent said yes and we did have an apprehension on July 5th and there were multiple apprehensions. And that was between the period of June 22nd and July 5th during which we apprehended numerous individuals. And there's no doubt that apprehension was of Mr. Rodello? We mentioned nothing about that. I know, but you didn't mention his name, but there's no doubt that was an apprehension of Mr. Rodello. It was not clear to me at the time. I'll be honest with you, Your Honor. I wasn't actually focused on that particular. But you're not contesting it was Mr. Rodello? Yes, I did. Okay. Mr. Rodello was also represented by counsel at the time and his testimony, as the court I believe also found, would have been subject to the same Fifth Amendment protections as Veronica Ojeda's in that he was only charged with the 952-960, bringing in methamphetamine, not the conspiracy. So he would have maintained the same privilege as Veronica Ojeda. I don't know the answer to this. If somebody asked him on the stand who was the source of your methamphetamine, would he have a privilege as to that issue? Yes, Your Honor, because I think that would establish a conspiracy. Once you're admitting that that's not just an amount that you owned and you are now admitting to facts that might support a conspiracy. I read the record where Mr. Rodello's counsel testified. But is there anything in the record for Mr. Rodello saying he would take the Fifth? There's nothing in the record. And to be clear, Your Honor, we found out about this on day six. Good, because there was originally an ex parte proceeding, I understand. Yeah, and when given the opportunity to actually call, and I'll highlight to the court one of the most magnificent. Before you go on there, your counsel. Don't interrupt yourself because I was following what you were saying. Go ahead. Where were you going with the first part of that sentence? Oh, with Rodello's testimony? Yes. Backing up to the teleconference, or actually the proceedings with the ex parte. As I reviewed the record last night, I was reminded that even the defense counsel suggested that he didn't know what was going to be said. And he actually said as much on page 808 of the supplemental excerpts of the record. Rodello said the court asked, have you met the guy? The response, no, no, no. So with him not being here, there's no telling, suggesting that there's no telling what he would say. That's why I don't want to put him on the stand, absent being able to meet with him in advance. I mean, even the defense counsel who proffered. And that leads to the question I was going to ask, so thank you. There's really two points I want some clarification on. Your counter proffer when it was made in open court was the ROI, was it not? I didn't make a counter proffer as to that, Your Honor. I thought the judge says that you made a counter proffer, and I'm trying to figure out what it is. I made a counter proffer as to Veronica Ojeda. But not as to Rodello? Your Honor, to be clear, the information that I have about Rodello comes to me by way of his plea agreement and his requirements on the sentencing. Who put the ROI into the record? Was it the defense? The defense, Your Honor. Okay. And then did, no, the other question was answered. Thank you. With respect to Veronica Ojeda's testimony, I think the record is fairly clear, and the court made a good finding that if asked, Veronica Ojeda would also be able to assert her Fifth Amendment privilege. And as to her testimony, if she had been allowed only to testify as to those matters which she did not retain the privilege, it would have so distorted the fact-finding process that it would have been- How do you distinguish U.S. v. Shirley? I think actually U.S. v. Shirley supports our position, and I'll just refer to a little bit right at page 1133. In that case, or in the finding, the court held that a district court's refusal to issue a subpoena under Rule 17b is clearly appropriate when the testimony sought is cumulative. Considering this fact together with the restrictions on cross-examination, we conclude that the district court did not abuse its discretion. Shirley supports the position. The court found that the defense had the opportunity to put in this testimony regarding the multiple conspiracies through Ulloa's testimony. This would have been cumulative to that. He had already testified on cross-examination for the defense about those multiple conspiracies as he saw them. It's the United States' position that even if he had put in that evidence, that was part of an ongoing conspiracy with Lomelli. It would have been the United States' position that we would have introduced evidence to show that that was still connected to the same conspiracy as Lomelli and Ulloa and Ponce and Tang and all the other conspirators. Trying to separate that out, I think, would have been unfruitful for the defense. I mean, if you step back, Your Honor, the overwhelming amount of this evidence focused on four seizures completely unrelated to those involving Veronica Ojeda. Those were mentioned during the phone calls, but the evidence from those particular seizures, the drugs that came in, were not introduced. We focused on the other four seizures. If we wanted to put in that evidence, we would have sought out immunity for the witness and tried to get her to testify because that was all part of the same conspiracy. How long did this trial last? It lasted, I believe, eight days at the end of it. So what would have been the problem with delaying or waiting a week or two to get Mr. Rudello? The approximate duration of the delay would have been 10 days. Now, why would that be? The defendant was in Supermax in Colorado, and the transport time, and he was also in the SHU, in the segregated housing unit at the Colorado facility, and I believe the time delay in making the arrangement for the transportation accounted for that. But I wasn't involved with the discussions with Marshall. That's just what is from the record. Obviously, we were at a disadvantage. Had we known, I would have called Rudello. I mean, that would have been my position, yes, let's put Rudello on. We would put the evidence in there. We didn't have that opportunity. We chose to focus on some discreet acts because of the overwhelming amount of evidence in this case. We had to chop it down to fit it into a reasonable time frame. But Rudello's transport time, that was something that the Marshall came in. But from the day that the writ was issued to, I guess, the sixth day of trial, wouldn't that have accounted for the transport time? That's something that's not clear from the record, Your Honor. I was excluded from the conversations with the Marshalls. Those were all ex parte until day six or seven of the trial when I was brought in. And I've reviewed the record, and what appears to me, based on the conversations with the Marshalls, was that there was some glitch, that there was no ability or that the writs weren't properly transmitted by the court to the Marshalls or there was some other issue there. That's the only thing I can glean from the record, Your Honor. But as to Rudello's testimony, it was, even if he had called Rudello, it was just mere speculation about something that was really not an issue other than an offhand comment or an offhand response to a question during the course of a six-day trial where evidence has been presented about focusing on numerous other seizures. And back to one of the issues that the court mentioned, the sentencing wasn't based at all on that particular seizure. That wasn't attributed to this defendant's sentence in any way. What about Mrs. Ojeda's transactions? Neither Ojeda's nor Rudello's, because the court limited the United States to only that evidence that was admitted at trial. If the court reviews the record, they'll see that the court did not allow or did not account for that and, in fact, said, No, United States, you proved up a base offense level 36. You didn't get in more than 4.5 kilos. And in spite of their sentencing papers to the contrary proving up by preponderance using the affidavit from Special Agent Flood and using some of the other line sheets, the court said, No, I'm only going to consider that drug evidence that you introduced at trial. And in this case, that resulted in a base offense level 36. So it was more than 1.5 kilos and less than 4.5 kilos. And that was attributed to the seizures at the ports of entry on May 30th, June, those four seizures, and then the seizure from the great court residence on July 17th. But not the July 5th seizure from Rudello. Not the July 10th seizure, Your Honor. 10th, I'm sorry. I'm sorry, it was July 5th was the seizure from Rudello. Yes, I thought I had it right. Did the jury make the quantity finding? The jury made a quantity finding more than 50 grams actual. All right. With respect to the, even if this evidence, even if their testimony, if it was error to exclude or not to deny the risk, Your Honor, the United States position is that, in this case, the overwhelming nature of the evidence made it harmless error. This would not have been affected the trial outcome in any substantial degree with their testimony. The evidence clearly laid out the conspiracy and Lomelli's participation in the conspiracy. We'd ask that if there's no further questions, we'll submit on that, Your Honor. All right, thank you, counsel. United States v. Lomelli will be submitted. We'll take up.
judges: Wardlaw, Hurwitz, Rice